UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

BISHOP JOHNSON                                                    :

               Plaintiff,                              :    **FIRST AMENDED COMPLAINT**

                                :

             -against-                              :    JURY TRIAL DEMANDED

                                :

THE CITY OF NEW YORK, POLICE OFFICER              :    14-CV-4912 (ENV)(CLP)
WALTER MARIN, (Shield no. 8151); POLICE
OFFICER MICHAEL WEBER, (Tax no.                   :
929343); POLICE OFFICERS "JOHN DOES"
nos. 1-8, individually and in their official      :
capacities (the names John Doe being              :
fictitious, as the true names are presently       :
unknown),                                         :
               Defendants.                            :

----------------------------------------------------------------- X

       Plaintiff, BISHOP JOHNSON, by and through his attorney, **KENNETH F. SMITH,**

**PLLC**, complaining of the defendants herein, respectfully shows the Court and alleges:

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which plaintiff seeks relief for violation of plaintiff's

rights as secured by 42 U.S.C. §§ 1981, 1983 and 1988; and the First, Fourth, Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the

laws of the State of New York.

2.    Plaintiff's claims arise from an incident that took place at his home in Brooklyn,

New York on or about April 5, 2014 during which members of the New York City Police

Department ("NYPD") subjected plaintiff to, among other things: assault, battery,

unlawful entry, unlawful search and seizure, false arrest, unreasonable force, failure to

intervene, reckless and intentional infliction of emotional distress, unlawful seizure of

property, and falsification/manufacture of evidence

3.     Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of costs and attorney's fees, pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

4.     Jurisdiction of this Court is invoked under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981 and 1983.

5.     The plaintiff further invokes this court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

6.     Venue herein is proper for the United States District Court for the Eastern District of New York under 28 U.S.C. §1391 (a), (b) and (c), in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District of New York.

## JURY DEMAND

7.     Plaintiff demands a trial by jury in this action.

## PARTIES

8.     Plaintiff BISHOP JOHNSON is a resident of Kings County, New York State.

9.     The plaintiff is a thirty-two year old African-American male.

10.     Defendant CITY OF NEW YORK ("the CITY") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the CITY, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the

appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the CITY was responsible for enforcing the rules of the NYPD (and regulations of the NYPD patrol guide), and for ensuring that the NYPD personnel obey the laws of the United States and of the State of New York.

11. Defendants PO WALTER MARIN, Shield no. 8151; PO MICHAEL WEBER, (Tax no. 929343); and POS "JOHN DOES" nos. 1-8 are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of defendant the CITY and/or the NYPD, a municipal agency of defendant the CITY. Defendants Marin and Weber are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of defendant the CITY were acting for, and on behalf of, and with the power and authority vested in them by defendant the CITY and the NYPD, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

12. The defendant officers are sued in their individual and official capacities.

## STATEMENT OF FACTS

13. On April 5, 2014, approximately 6:20AM, plaintiff was asleep inside his residence at 49 Albany Avenue, Brooklyn, NY.

14. 49 Albany Avenue Brooklyn, NY is a multi-story, multi-unit apartment.

15. At the above approximate time, plaintiff was awakened by defendant Marin and other members of the New York City Police Department ("NYPD"), defendants "John Does" 1-8, who burst forcefully and suddenly into the home at gunpoint.

16.　If the defendant officers had a search warrant, it was issued upon the basis of extremely unreliable information, the unreliability of which was withheld from the issuing magistrate.

17.　If the defendant officers had a search warrant, they obtained it by failing to properly supervise and verify the reliability of an informant against NYPD policy and procedures to ensure the reliability of the confidential informant and the confidential informant's information before obtaining the warrant.

18.　If the defendant officers had a search warrant, they went beyond its scope and entered areas of the building they were not permitted to enter.

19.　Defendant officers immediately placed plaintiff—and everyone else inside the residence—into handcuffs, without explanation.

20.　Defendant officers seized some $1165 dollars belonging to plaintiff, and one of the defendant officers placed the money belonging to plaintiff into his pocket.

21.　Defendant officers transported plaintiff and others arrested ("T.B.", "D.S.", "C.R.", and "TH.B.") to the 81 Precinct.

22.　Defendant officers ignored plaintiff's repeated requests that the handcuffs be loosened as they were causing pain and injury to plaintiff's wrists.

23.　Plaintiff suffered pain, and later, bruising and swelling to the wrists as a result of handcuffs being tightly applied.

24.　Defendant Marin drafted arrest paperwork listing the basis of plaintiff's arrest as "PL 221.10(1), Criminal Possession of Marihuana in the Fifth degree", (that is, that plaintiff had been observed in possession of marihuana in a public place, or that the marihuana was either burning or open to public view).

25. Defendant Weber, upon information and belief the supervising sergeant, approved, sanctioned, ratified and condoned the arrest.

26. Plaintiff was in the custody of defendant officers and other members of the NYPD for over forty one hours before he was arraigned on a Criminal Court Complaint in Kings Criminal Court, on April 6, 2014.

27. Plaintiff was charged with the Violation of "Unlawful Possession of Marihuana" under NY Penal Law § 221.05 and released on his own recognizance.

28. On May 30, 2014, the case was dismissed upon application by the district attorney.

## GENERAL ALLEGATIONS

29. The individual defendants acted in concert in committing the above-described acts against plaintiff.

30. Plaintiff was not in possession of marihuana or any other contraband at the time he was arrested.

31. Plaintiff did not resist arrest at any time during the above-described incidents.

32. Defendant police officers unlawfully entered plaintiff's apartment, either without a search warrant, or if there was a search warrant, it was obtained on the basis of mistaken or false information and without due diligence performed by defendant police officers as to the veracity of the information presented to issuing magistrate.

33. The individual defendant officers acted under pretense and color of state law in their individual and official capacities and within the scope of their employment. Said acts by said defendant officers were beyond the scope of their jurisdiction, without

authority or law, and in abuse of their powers, and said defendant officers acted willfully, knowingly, and with the specific intent to deprive plaintiff of his rights.

34.   Upon information and belief, there exists an official NYPD policy with respect to the use of handcuffs.

35.   Upon information and belief, there exists a custom within the NYPD of using handcuffs inappropriately, specifically, by applying (and locking) them over-tightly with force far in excess of that needed to actually prevent a handcuffed person from withdrawing their hands from the handcuffs or otherwise "defeating" the handcuffs.

36.   Upon information and belief said custom of applying handcuffs over-tightly is used to maliciously cause discomfort, pain and injury to arrested persons in a manner that is difficult to identify or detect since application of handcuffs (subject to the policies and procedures governing their appropriate use) is a part of *every* arrest.

37.   Upon information and belief, there exists an official NYPD policy requiring that a supervising officer approve arrests made by non-supervisory officers.

38.   Upon information and belief, there exists an official NYPD policy requiring that arrest paperwork (and/or paperwork generated in connection with the arrest of a person) be signed and/or otherwise approved by a supervising officer.

39.   Defendants Marin and Weber have been sued in this Court for allegations freakishly similar to those alleged in this Complaint (13-CV-2546) and (13-CV-3591).

40.   In those cases, defendants Marin and Weber were alleged to have burst forcefully into the plaintiffs' apartment with no warrant, arrested plaintiffs, allegedly on the basis of having observed marihuana in public view (which was contested by both plaintiffs), forcefully handcuffed plaintiffs and denied their repeated requests to loosen

the handcuffs, abused plaintiffs verbally, damaged property in a fruitless search for contraband, and detained them for many hours, which arrests were later voided as "Declined Prosecutions" after the Brooklyn DA refused to prosecute.

41.    Upon information and belief, defendant officers Marin and Weber and other members of the narcotics teams they have worked with in the past, are the subject of NYPD Civilian Complaint Review Board ("CCRB") and/or Internal Affairs Bureau ("IAB") complaints and/or investigations.

42.    The actions by defendant officers Marin and Weber (in the cases already brought before this court and defended by defendant CITY, as well as in the CCRB and/or IAB complaints and/or investigations) demonstrate a *continuing* need, throughout the NYPD, especially regarding those officers on assignments to arrest persons in their homes for drug offenses, for training in the areas of, *inter alia*, (a) the rights of people to be secure in their homes and persons, and the legal requirements before those rights can be violated; (b) the probable cause requirement to make an arrest; (c) the appropriate use of force, especially with respect to handcuff use; (d) the legal meaning and limitations of the concept of "possession".

43.    Defendant CITY is aware of the propensity of defendants Marin and Weber to make bad choices with respect to situations they commonly encounter in the discharge of their specific duties as narcotics enforcement officers, (such as the probable cause requirement to arrest, appropriate use of force, use of handcuffs, requirement for veracity, etc.) yet despite that awareness, defendant CITY has failed to provide Marin or Weber with remedial training, has failed to discipline the officers in any meaningful way, and has failed to provide for increased supervision of the officers, and instead has

defended those officers in civil actions, acting as their apologist, and has paid settlement money to plaintiffs alleging violations of constitutional rights by defendant officers.

44.     Upon information and belief, defendant CITY commonly enters into settlement agreements with plaintiffs alleging constitutional violations, which settlement agreements completely deny any violations of any kind by defendant officers.

45.     Upon information and belief, defendant CITY settles cases involving constitutional violations by officers by paying money to plaintiffs in consideration for a general release of liability for the express purpose of being able to subsequently deny any knowledge of the need for increased supervision, training and discipline of the officer in question.

46.     Upon information and belief, defendant CITY settled the two prior cases against defendant officers alluded to above (13-CV-2546 and 13-CV-3591) for the express purpose of being able to subsequently deny the need for increased supervision, training and discipline of defendants Marin and Weber.

47.     Despite the practices of defendant CITY detailed above, and despite the strenuous efforts of defendant CITY to bury its head in the sand with respect to the dire need of defendants Weber and Marin for increased supervision, training and discipline, the CITY is aware of said need for increased training, supervision and discipline by defendants Marin and Weber, and has utterly failed to provide same.

48.     As a direct and proximate result of defendants' actions, plaintiff experienced personal and physical injury, pain and suffering, loss of liberty, fear, an invasion of

privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation, and financial loss.

49.   Plaintiff is entitled to receive punitive damages from the individual defendants because the individual defendants' actions were motivated by extreme recklessness and indifference to plaintiff's rights.

### FIRST CLAIM
### (UNLAWFUL ENTRY OF PREMISES AND UNLAWFUL SEARCH AND SEIZURE UNDER FEDERAL LAW)

50.   Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

51.   On the above incident date, defendant officers unlawfully broke into, entered, remained unlawfully inside of plaintiff's home and stopped and searched plaintiff's home and person without a warrant, or consent.

52.   Additionally defendant officers unlawfully seized property from plaintiff.

53.   Accordingly, defendant officers are liable to plaintiff for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## SECOND CLAIM
## (FALSE ARREST UNDER FEDERAL LAW)

54. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein

55. On the above incident date, defendant officers falsely arrested plaintiff without an arrest warrant, probable cause, or any reasonable suspicion that plaintiff had committed a crime.

56. Accordingly, defendant officers are liable to plaintiff for false arrest under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

## THIRD CLAIM
## (UNREASONABLE FORCE UNDER FEDERAL LAW))

57. Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

58. On the above incident date, defendant officers' use of force upon plaintiff was objectively unreasonable.

59. The individual defendant officers did not have an objective and/or reasonable basis to use any degree of force against plaintiff, since plaintiff was unarmed, compliant, and did not resist arrest.

60. Defendant officers applied handcuffs over-tightly to plaintiff by closing and locking them into a position where they constricted the hands well in excess of that level of force needed to safely restrain a human being.

61. Those defendants who did not touch the plaintiff but witnessed the unlawful conduct, but failed to intervene and protect plaintiff from this conduct are also liable to plaintiff.

62.     Accordingly, defendant police officers are liable to plaintiff for using unreasonable and excessive force, pursuant to 42 U.S.C. § 1983; and the First, Fourth, Fifth, Sixth, and Eighth Amendments to the United States Constitution.

## FOURTH CLAIM
### (FAILURE TO INTERVENE)

63.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

64.     On the above described incident date, some of the defendant officers did not have direct contact with plaintiff but had a reasonable opportunity to observe and to prevent the violations of plaintiff's constitutional rights, but they failed to intervene.

65.     Accordingly, those defendant officers are liable to plaintiff for failing to intervene to prevent the violation of plaintiff's constitutional rights.

## FIFTH CLAIM
### (FALSIFICATION OF EVIDENCE)

66.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

67.     Defendant officers are liable to plaintiff because, on the above described incident date, they intentionally conspired to fabricate evidence against plaintiff, depriving plaintiff of liberty without due process of law.

68.     Furthermore, defendant officers violated the law by making false statements by drafting and/or signing sworn criminal court complaints and false police reports.

69.     Furthermore, the defendant officers violated the law by manipulating evidence to attempt to obtain a prosecution and unjust conviction, while performing the function of investigators.

70.     Defendant officers were on notice that creating fabricated evidence is a clear violation of law because it well established that individuals who knowingly use false evidence at trial to obtain a conviction act unconstitutionally and that this is redressable in an action for damages under 42 U.S.C. § 1983.

71.     Defendant officers are also liable to plaintiffs because they intentionally created false information likely to influence a fact finder's or jury's decision by, inter alia, forwarding false information to prosecutors, drafting and signing a sworn criminal court complaint and police reports, omitting and/or manipulating evidence, fabricating testimony and evidence, suppressing and concealing exculpatory material and evidence, and forwarding and presenting false information to a court thereby violating plaintiffs' constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

72.     Accordingly, defendant police officers are liable to plaintiff for falsification of evidence pursuant to 42 U.S.C. § 1983; and the Fifth and Sixth Amendments to the United States Constitution.

## SIXTH CLAIM
## (FALSE ARREST CLAIM UNDER STATE LAW)

73.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

74.     On the above incident date, defendant officers falsely arrested plaintiff without, an arrest warrant, a lawful search warrant, probable cause, or reasonable suspicion that plaintiff had committed a crime.

75.     Accordingly, defendant police officers are liable to plaintiff for false arrest under the Constitution and Laws of the State of New York.

## SEVENTH CLAIM
## (ASSAULT & BATTERY UNDER STATE LAW)

76.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

77.     Defendant officers intentionally subjected plaintiff to apprehension of imminent & unwanted physical contact, fear, actual unwanted physical contact which caused pain and injury to plaintiff.

78.     Accordingly, defendant police officers are liable to plaintiff for false arrest under the Constitution and Laws of the State of New York.

## EIGHTH CLAIM
## (NEGLIGENT & INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER STATE LAW)

79.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

80.     The defendant officers engaged in extreme and outrageous conduct, intentionally and recklessly causing severe emotional distress to plaintiff.

81.     Plaintiff's emotional distress was inflicted through deliberate and malicious actions including the use of excessive force against, and the detention and arrest of plaintiff by defendant officers.

82.     Accordingly, defendant police officers are liable to plaintiff for false arrest under the Constitution and Laws of the State of New York.

## NINTH CLAIM
## (*MONELL* LIABILITY AGAINST DEFENDANT CITY OF NEW YORK UNDER FEDERAL LAW)

83.     The preceding paragraphs are here incorporated by reference.

84.    As a result of the foregoing, plaintiff was assaulted, unlawfully detained and deprived of his liberty, suffered physical injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

85.    All of the acts and omissions by defendant police officers Marin, Weber and "John Does" 1-8 were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, cooperation and under the supervisory authority of the City and its agency, the NYPD.

86.    The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

87.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e. arrest quotas)

    b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

        i. in order to protect other officers; and/or

        ii. in order to meet said productivity goals;

    c. Failing to supervise, train, instruct and discipline · police officers and encouraging their misconduct;

    d. Discouraging police officers from reporting the corrupt or unlawful acts of . other police officers;

    e. Retaliating against officers who report police misconduct; and

    f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

88.     The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

      a.  *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (Police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

      b.  *Long v. City of New York*, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pagan, 06-H6- 2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint is convicted of falsifying police records);

      c.  *Tayler-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct;

      d.  *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person who was lawfully photographing the arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence[1]);

      e.  *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the City's motion to dismiss on *Iqbal/Twombly* grounds wherein the police officers at issue were tried and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Jack Weinstein wrote:

            Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by the arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the

---

[1] For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists N.Y. Times*, March 30, 2010, available at: http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/?_php=true&_type=blogs&_r=0

police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f.  *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely; maintained a stash of narcotics to plant on innocent civilians in order to help those' officers meet their arrest quotas; Mr. Anderson testified  concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stick: "*It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it.  The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway.  That kind of came on to me and I accepted it—being around that so long, and being an undercover.*"  The presiding judge, the Honorable Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naive regarding the realities of narcotics enforcement.  But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even  more  distressingly, by  the  seeming  casualness by  which  such  conduct  is  employed.")

g.  *Bryant v. City of New York*, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiffs constitutional right  and contributed to her arrest[2]);

h.  *Williams v. City of New York*, 06-CV-6601  (NGG), 2009 U.S. Dist. LEXIS [1] 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing: project despite evidence that he had a legitimate reason to be on the premises);

i.  *MacNamara v. City of New York*, 04-CV-9216   (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided  by officers to attempt to cover-up or justify  unlawful mass arrests of approximately  1800 people has been and continues, to  be  developed in

---

[2] For a description of this case and ultimate settlement, see, Oren Yaniv, Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000, N.Y. Daily News, Feb. 19, 2011, available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

the consolidated litigation arising out of the 2004 Republican' National Convention);

j.   *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers, fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k.   *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

l.   *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

m.   *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 2n04 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

n.   *Nonnemann v. City of New York*, 02-CV-10131  (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966  (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

o.   *Richardson v. City of New York,* 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, against an African American man in Kings County and initiated  drug charges against him, despite an absence of any quantum of suspicion);

p.   *Barry v. New  York  City Police  Department*, 01-CV-10627 (CBM), 2004 U.S. LEXIS  5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about  police  misconduct and encouraging, if not facilitating, silence among officers");

q.   *Taylor v. City of New York*, 01-CV-5750(ILG)(MDG) (E.D.N.Y.)  (same as *Richardson*; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

r.   *White-Ruiz v. City of New York*, 93-CV-7233 (DLC)(MHO), 983 F.Supp. 365, 380 (S.D.N.Y.1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

s.   *Ariza v. City of New York,* 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at 14 (E.D.N.Y.) (police  officer  alleges  retaliatory  duty assignments  and  harassment in response to his allegations about a

racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

89. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*, by the following:

a. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them[3].
>
> [...]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty.[4] "

b. In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant

---

[3] See Mollen Commission Report, page 36
[4] Mollen Commission Report, pages 40-41

William Eiseman pleaded guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another - and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here.[5]"

c. In late 2909, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released[6]. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies. Sources told The Post their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports[7].

d. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted for those offenses. The 109th precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's office for "plant[ing] drugs on suspects and steal[ing] cash during gambling

---

[5] Melissa Grace NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal, N.Y. Times June 27, 2011 , available at: http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288.
[6] Murray Weiss NYPD in a Liar Storm N.Y. Post, October 26, 2009, available at: http://nypost.com/2009/10/26/nypd-in-a-liar-storm/
[7] Id.

raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States attorney Monica Ryan, members of the 109th precinct maintained a small stash of drugs in an Altoids tin for this purpose."[8]

e. In December of 2009 two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and (Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting.
>
> Police sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.
>
> "There's pressure on the cops from the bosses and they're getting pressured from headquarters, a police source told The Post.[9]

The officers were indicted for felony perjury, filing a false report and filing a false instrument[10].

[8] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at*: http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352

[9] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at*: http://nypost.com/2010/07/30/cops-sting-cops/

f.  In early 2010, the City settled a civil rights lawsuit wherein Police Officer Sean Spencer[11] falsely arrested and accused a 41 year old grandmother of prostitution, promising to pay the woman $35,000.  In Court documents, Caroline Chen, the attorney representing the City in the case, admitted "Officer Spencer falsely reported to the Assistant District Attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that the plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.[12]

g.  Separate Grand Jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking onto drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports.  District attorneys and their assistants interviewed during a four-month investigation by the New York Newsday said they believe those two grand jury investigations—in the 46th Precinct in University Heights section of the Bronx and the 34th Precinct—are not isolated instances.  They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[13]

90.  Furthermore, the existence of the aforesaid unconstitutional customs and policies, **specifically with regard to "productivity goals,"** may be further inferred from the following:

a.  Deputy Commissioner Paul J. Browne has repeatedly admitted that the NYPD commanders are permitted to set "productivity goals."[14]

b.  An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments.  "All they care about is …summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD's Stop, Question and Frisk reports.  She added, "The bottom line is everybody's individual activity is being looked at."  Later in the recording—

---

[10] John Marzulli *Brooklyn Cops Charged With Barging Into Sting Operation, Arresting a Fellow Officer on Bogus Charges*, N.Y. Daily News, July 30, 2010, *available at*: http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251

[11] In sum, the City has paid more than $80,000 to settle four federal lawsuits against Officer Spencer.  John Marzulli, *City Shells Out $35G To Grandmother, Monica Gonzalez, Busted As Hooker*, N.Y. Daily News, January 7, 2010, *available at*: http://www.nydailynews.com/new-york/city-shells-35g-grandmother-monica-gonzalez-busted-hooker-article-1.459661

[12] *Id.*

[13] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, Others Say Department Overlooks Corruption*, New York Newsday, November 18, 1991, at 6.

[14] Jim Hoffer, *NYPD Officer Claims Pressure To Make Arrests*, WABC-TV Eyewitness News, March 3, 2010, *available at* http://7online.com/archive/7305356/

made during a roll call in 2010 at Transit District 34 in Coney Island—she said only officers with "good productivity" will get the opportunity to work overtime.  She also said that Capt. James Sherrin wanted every officer to make at least one arrest per month—up from a previous order of one every three months—because crime had spiked and arrest totals were lower than the other transit districts.  "He wants everybody to get in the mindset that there's no more 'collar a quarter,'" Williams said.[15]

c.  NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month.  P.O. Polanco's allegations were confirmed by an audiotape obtained by the media.  The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and twenty is breaking your balls, guess what you'll be doing?  You're going to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, twenty-five and one, thirty-five and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing 'til then."[16]

d.  The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat-belt, bus stop, tinted windows, and truck route violations they were expected to issue.  The memos remained posted for several weeks in the roll-call room until the media began inquiring.[17]

e.  Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[18]

f.  In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott."  As one officer at the

[15] Rocco Parascandola, *NYPD Lt. Janice Williams Captured On Tape Pushing For More Busts, But Brass Says There's No Quota*, N.Y. Daily News, March 3, 2011, *available at*: http://www.nydailynews.com/new-york/nypd-lt-janice-williams-captured-tape-pushing-busts-brass-quotas-article-1.116880

[16] *Id.*

[17] James Fanelli, *Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say*, N.Y. Daily News, Nov. 8, 2010, *available at*: http://www.nydailynews.com/new-york/cops-brooklyn-crime-ridden-77th-precinct-told-meet-quotas-moving-violations-memos-article-1.452621

[18] Tom Nanako and Kirsten Fleming, *Nighttime Riders In Big Sit Fit*, The New York Post, December 26, 2009, *available at*: http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/

precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[19]

g.   In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a Deputy Inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying, "I'll come down here and make sure you write them."  Marino also vowed to transfer people, just like he did when he was the commanding officer of the 75th Precinct in East New York.[20]

h.   Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that arrest numbers are a factor in evaluating an officer's performance.[21]  Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make, that violated plaintiffs constitutional rights and contributed to her arrest."[22]

i.   The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violations citations, three "quality of life" summonses, make one arrest and two stop-and-frisks each month.  Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations."  She ordered the City to cease and desist from the practice.[23]

j.   Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the North Bronx, was investigated for ordering officers to make a certain number of arrests each month.  According to the New York Daily News:

[19] Rocco Parascandola, *Irate Cops at the 79th Precinct in Bedford Stuyvesant Threaten Boycott Over Quotas*, N.Y. Daily News, December 12, 2009, *available at*: http://www.nydailynews.com/news/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648

[20] Rocco Parascandola, *Deputy Chief Michael Marino Threatens Cops at the 79th Precinct Who Want To Go On Summons Strike*, N.Y. Daily News, December 15, 2010, *available at*: http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513

[21] William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011 at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15 2011, at 20, also available at Westlaw on WLNR 2986205.

[22] Oren Yaniv, *Court Rules That Cops Do Use Quotas, Woman Injured In 2006 Arrest Settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at*: http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

[23] *New York City Ticket Quota Confirmed, Denied*, The Newspaper.com, January 21, 2006, *available at*: http://www.thenewspaper.com/news/09/914.asp; see also, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas—Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at*: http://passaicnews.wordpress.com/2007/08/15/nypds-bogus-little-secret-parking-ticket-quotas/

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine dollars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of the arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on—so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[24]

91.    The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are  further evidenced, *inter alia*, by the following:

   a. The Report of the Commission To Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

   > In the face of this problem [of corruption] the [NYPD] allowed its systems for fighting corruption virtually to collapse.  It has become more concerned about the bad publicity that corruption disclosures generate, than the devastating consequences of corruption itself.  As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out.  Such an institutional reluctance to uncover corruption is not surprising.  No institution wants its reputation tainted—especially a department that needs the public's confidence and partnership to be effective.  A weak and poorly resourced anti-corruption apparatus minimizes

---

[24] Allison Gendar, *NYPD Captain Allegedly Caught In Arrest Quota Fixing*, The New York Daily News, November 14, 2007, *available at*: http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006

the likelihood of such taint, embarrassment, and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority—which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[25]

b.  Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c.  In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New* York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread...custom or policy by the City approving illegal conduct" such as lying under oath and false swearing, then NYPD Commissioner Raymond Kelly acknowledged, "When it [corruption] happens it's not for personal gain. It's more for convenience."[26]

d.  Regarding the City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[27]  When it does, however, it has been the custom and practice to vest sole control over whether the NYPD pursues the matter with the Police Commissioner, who is also the sole person with authority to impose discipline on the subject officer(s). During Police Commissioner Ray Kelly's tenure, since 2005, only one quarter of the officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions."  Moreover, the number of CCRB-substantiated cases that the NYPD has simply

---

[25] Mollen Commission Report, pp 2-3, *available at*: http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf

[26] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, The New York Daily News, December 2, 2009, *available at*: http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710

[27] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about six percent).  Similarly, in 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about five percent).  In 2013, out of the more than 5410 allegations that were fully investigated, the CCRB substantiated about fourteen percent.  *See* CCRB Jan.-Dec. 2007 Status Report at p 19, and CCRB 2013 Status report *available at*: http://www.nyc.gov/html/ccrb/downloads/pdf/CCRB%20Annual_2013.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above noted *de-facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

dropped (i.e. closed without discipline or any kind of action) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by CCRB in 2009.[28] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[29]

92. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct** are further evidenced, *inter alia*, by the following:

   a. Former longtime New York City District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

   b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

   c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced in every way."

93. The existence of the above-described unlawful *de-facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the

---

[28] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19, *available at*: http://cityroom.blogs.nytimes.com/2009/10/05/few-results-for-reports-of-police-misconduct/?_php=true&_type=blogs&_r=0

[29] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police,* August 20, 2008.

City, including, without limitation, Police Commissioner William Bratton, and his predecessor, Raymond Kelly.

94.     The actions of defendant officers Marin, Weber and "John Does nos. 1-8 resulted from and were taken pursuant to the above mentioned *de facto* policies and/or well-settled and widespread customs and practices of defendant CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and then Police Commissioner Bratton who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves or fellow offices, supervisors and/or subordinates against those civilians.

95.     All of the foregoing acts by defendants deprived plaintiff of his federally protected rights, the constitutional rights enumerated above.

96.     Defendant CITY knew or should have known that the acts alleged herein would deprive plaintiffs of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

97.     Defendant CITY is directly liable and responsible for the acts of defendant officers Weber, Marin and John Doe nos.1-8, because it repeatedly and knowingly failed to properly supervise, train instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and the NYPD and to require compliance with the Constitution of the United States.

98.     Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then Commissioner Ray Kelly, have not taken steps to terminate these policies, practices and/or customs or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

99.     The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers are evidenced by, inter alia, the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, defendant officers Marin, Weber and John Des nos. 1-8 felt empowered to arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up the blatant violations of plaintiff's constitutional rights, and supervising officer John Doe no. 1 felt empowered to sanction and ratify and endorse said false story. Pursuant to the aforementioned City policies, practices and/or customs, other officers failed to intervene in or report defendant officers' violations of plaintiff's rights.

100.   Plaintiff's injuries were a direct and proximate result of defendant CITY and the NYPD's wrongful de facto policies and/or widespread and well-settled customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

101.   As a result of the foregoing, plaintiff was assaulted, unlawfully detained and arrested, deprived of his liberty, subjected to the criminal justice system, incurred legal fees, suffered great humiliation, costs and expenses, and was otherwise damaged and injured.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands a jury trial and the following relief, jointly and severally against the defendants:

a. Compensatory damages in the amount of two hundred and fifty thousand dollars ($250,000);

b. Punitive damages in the amount of five hundred thousand dollars ($500,000);

c. Costs, interest and reasonable attorney's fees, pursuant to 42 U.S.C. § 1988; and,

d. Such other and further relief as this Court may deem just and proper, including injunctive and declaratory relief.

DATED:      Brooklyn, New York
            December 3, 2014

KENNETH F. SMITH, PLLC
16 Court Street, Suite 2901
Brooklyn, New York 11241
(646) 450-9929
kfslawfirm@gmail.com
ATTORNEY FOR PLAINTIFF
By: